Good morning. May it please the court, my name is Tom Dillard and I represent the appellants officers Barnard, Theobald, and Radmanovich in this case before the court today. I'd like to reserve three minutes, your honor, for rebuttal and response. Watch your time. I'll try to help you with that, but just as you may know, as long as the green light is on, you've got time. If the red light is on, the trapdoor yawns beneath your feet and you disappear. I'll be mindful of that, thank you. This case is up on appeal following principally denial of a Rule 50b motion made after a jury verdict and that assigns the treatment of that motion as error along with a multitude of errors, both pre-trial and through trial, that permeate this record. I frankly probably won't have the time to respond to each and every one of them, but those errors, I think it's important to note, have a compounding effect prejudicially and have affected and tainted the jury verdict. It's important to understand the most, the principal error here and the cumulative and culminating error of denial of qualified immunity is understanding not what the court did wrong, but what it did right. The court in listening, the district court in listening to the trial and in deciding the qualified immunity defense at 50a stated that this is the way it was going to be handled. There was going to be two special interrogatories submitted to the jury to resolve the factual disputes necessary to then apply what the trier fact did to the law to determine whether the officer's conduct was objectively reasonable in light of well-established law. The court in it heard nothing to suggest that there was undue or excessive force used if in fact the plaintiff was resisting or the officers reasonably mistook that he was resisting. I've got a question for you. The jury's finding wasn't time limited, if I recall correctly, so couldn't the jury's answer have pertained to what originally occurred when there was the first encounter but not speak to the latter events? Well, Your Honor, two things on that. One is it is true that the way that the special interrogatories were framed did not suggest it was for a snapshot in time. It simply said, at least on interrogatory two, which asked was it reasonable for the officers to believe there was resisting, was there resistance during the arrest event? And the answer is yes. And the court, finding no basis to ask questions in time intervals, didn't submit those to the jury. Plaintiff didn't ask for those submissions. Indeed, the court said, based on what I heard, these are the issues of fact for the jury to decide. Was he resisting? And if not, was it reasonable for the officers to believe that he was? And then afterwards, I think that's what the court did, however, Your Honor, in addressing your question is, in hindsight, plug in a third question, that it wasn't asked, that the court said didn't have a need to ask it, that was relied upon, and that's the way the case was argued through a closing. Well, it could have been based on a time event for which the officers then used excessive force outside of when they said the mistake occurred as to his resisting. Did your client ask the district court to do these questions in a segmented fashion? In other words, on question two, if your answer is, favors the law enforcement officers, stop. Did you request that? No, Your Honor, how that occurred is 50A, the defense argued qualified immunity stands. The court said at that point, I think there's an issue of fact on resisting, and I agree under Saussure's view of the law that the reasonable mistake also, and so the court sua sponte drafted those. We relied upon what the court did. Plaintiff didn't suggest that there were some other requests asked of them otherwise, and the court specifically said, in answer to your question, Judge Hawkins, it doesn't matter what they do on question three and four, but questions one and two will arm me with the facts to decide the issue of law component of qualified immunity. But it didn't say, if you answer yes here, stop, or if you answer no here, go on. He said, I'm going to submit these four questions to the jury, and the first two are going to basically be the factual predicate for me to decide qualified immunity at 50B. And so leading up to it, the inescapable conclusion, the record is, if the jury said yes on one or two, that will result in a qualified immunity finding and a verdict for defendants. I take it you argued that to the district court? Yes, Your Honor, we argued that at 50B. And what did the district court say? Well, the order that you have, that we're appealing upon, is the court kind of went through a, I guess you'd call, guesswork of what the jury could have done. And it said, in that order, you know, critical questions remain unanswered. The court didn't think there was other questions to ask on the front end, but the back end, the court said, based on the response from the plaintiff, critical questions remain answered and guessed. They could have thought this, they could have thought that, they could have thought something else. It sounds like, from your description, that the judge changed his mind. I would certainly say that's the case, Your Honor. And he changed his mind. Did he say why? No, he didn't. And I think that's why you have the order you did, is finding a way to save the verdict and then doing a remittitor. But here's the problem with what the court did. When it did that, it violated the law. When the court changed its mind, it effectually made the answer number three that the jury made dispositive on the whole case. And that question was, was a reasonable force yes or no? I suppose the other explanation is that your impression of the judge's mind before the interrogatories went to the jury and afterwards was consistent. Your Honor, I can't speak subjectively for the judge. I can only refer to you to, in the record, 1732 and 33. And we quoted those directly in the reply brief about what the court said when framing the special interrogatories to the jury. He said, there is nothing here that I heard that talks about unreasonable force if, in fact, he was resisting. And then explains under Saussure, if they reasonably believe he was resisting, the same thing is true. Was that charge conference before or after closing argument? And when did he give the charge? It was before. It was made, I believe, Judge Carr at time of 50A, which had been the close of plaintiff's case. And then it was settled at jury instruction time before closing. Before closing. I mean, might it not be entirely possible that upon hearing the summation and closing argument, he might have said to himself, hey, wait a minute. There is a temporal break between the time he was subdued and the continued application of unnecessary and excessive force, realizing that's also an extremely disputed issue in the case. Might that not have... I mean, any judge, you hear the evidence, you go along. Candidly, you may or may not be paying the kind of attention you should. You prepare the charge, and then the case is laid out for you just as it is for the jury. And might he not have gotten a different impression from the closing argument? Your Honor, I'm unable to tell you. There was something said in closing argument that Okay, that's all I'm asking. I realize we can't peer in the judge's mind and it's speculation, but I think the important question is the timing of it. When he decided to give the questions, whether it was before or after having her closing. That's certainly true, Your Honor, because that's a fundamental fairness issue. You can't very well change the nature of the test afterward. Set up a target, have that argued for, change it afterward, so put in a new question and guess how the jury would answer it. And that's what happened. And in doing so, here's the violation of the law that reverted the jury's finding to pre-sauciere view of the law. That is, the old law in this circuit was the Fourth Amendment issue and the qualified immunity issue were coextensive. If they were unreasonable force, then that pierced qualified immunity. But 2001, the Supreme Court said that's not the way it works. And that qualified immunity is up and above the Fourth Amendment. So when the court went back and said, well, they said unreasonable force, it's stripped the officers of qualified immunity. And that's in violation of the law. I would say on the factual component, Your Honor, this is what the record says. The factual component is after Mr. Bernard was cuffed, there was two officers that were keeping him on the ground in a prone position momentarily. At that moment, two other people came into the event, the wife and the brother. The first officer who he said was up near the neck immediately left to go handle that and make the situation static. The second officer who had a leg down below, and this is the plaintiff's testimony, moved it up back. But it's important to say that there was no evidence that there was any difficulty breathing. There was no evidence that he was unable to speak. There was no evidence that he said, you know, you're hurting me. And he said when his wife came, I was able to turn my head and look at her, suggesting that he didn't have undue pressure on the neck. And that's where all the other areas of prejudice came in on the rulings on damages as to how those injuries occurred. I didn't mean to interrupt you. I take it from your description that after the jury answered the interrogatories, that you argued to the judge, Judge, you said earlier that if questions one and two were the only factual questions relating to qualified immunity, and if they were answered in my client's favor, that's the end. They're entitled to qualified immunity. Can you point in the record so I can digest that argument? Well, Your Honor, I think under the rule, the court doesn't want me to put in the pleadings, but there was a motion, a written motion filed at 50B. I'm happy to supply that to the court if it would help. And that motion did what Judge Hawkins talked about? Yes, Judge Smith, it certainly did. I would say also the transcript wasn't available at the time that 50B motion was made. We certainly reminded the judge this is what he said. This was the setup. This has to be the result based on the setup. But I couldn't quote for him chapter and verse from the transcript at the time that motion was made. 1732-33 is his response? That's his response, Your Honor. As to the special interrogatory, his response to the latter will be the order denying the 50B. Okay. And I'm down to my last three minutes. If there's no other questions, I'll reserve it. Okay. Very good. Thank you. It's Ms. Amiel? Armeni. Armeni. I apologize. I couldn't read this writing here they put down. May it please the court. My name is Paola Armeni from the Law Firm of Gordon and Silver in Las Vegas. And I represent Chuck Bernard. Did you try the case? I did, Your Honor. And Your Honor, I'd like to start sort of where the whole topic has been on the interrogatory. Mr. Dillard is correct. The plaintiffs did not provide any input on the interrogatories because we took the position that we were objecting. We didn't think the interrogatories were necessary. So therefore, we objected and had no input and that objection was noted for the record. The defendants, on the other hand, received the interrogatory and reviewed it and informed the district court judge that they were fine with the wording of the special interrogatories. So they, as well, did not object and actually conceded that the verbiage used in the special interrogatories was the appropriate language to be used. How do you deal with the answer? Do you think that the interrogatories were time limited and therefore didn't speak to what happened after the initial encounter? Is that your perspective? I believe that's a reasonable interpretation and this is why. Defendants counsel argued throughout the case into closing arguments that the mistake, this reasonable mistake that happened was when the initial handcuffing took place. The testimony was from Chuck that his hands were up on the wall and one of the officers came behind, slapped his wrist, and tripped over this plant stand, which is also cooperated by some neighbors. So that initial falling is what the focus really was on with this reasonable mistake of fact. So based on the totality of the circumstances, looking at the undisputed fact that when Chuck was on the floor with the knee and the neck and the back, he was no longer resisting, he was handcuffed. So clearly right there, the jury, it wouldn't have been reasonable for the jury to believe that he was resisting because both parties were in agreement that he was not resisting at that point. And your understanding is that Judge Jones was focusing on the post, what shall I say, after the handcuffing, after he was completely controlled. Is that correct? I'm sorry. Can you ask me that question again? I apologize. I'm sorry. My voice is a little croaky here. After your client was subdued, that's the time that you think Judge Jones focused on these other issues as opposed to what the jury said in the special interrogatories? No, Your Honor. I think that there's evidence throughout. I think the jury had sufficient evidence because there were three different steps, if you will. There was a choke hold that initially took place where he was pulled up and then pushed to the ground and there was pressure still applied to his neck. That is a disputed fact. All three officers said that never happened. So that puts us in a difficult position because we're fighting on, okay, usually we have in qualified immunity cases, we have a situation where a police officer may admit, yes, I did this and this is why. Here we don't have that. So we're in a difficult position to challenge. First of all, choke hold is not within their policy. They have to do the lateral vascular neck restraint. And that is what they are allowed to do pursuant to their own policy, but yet we couldn't challenge that because they said they didn't do it. So we have no idea if what they did was appropriate. Chuck described it as a choke hold, which is completely against Metro's policy. It's kind of hard to review the policy handbook when you're wrestling with a person that you're trying to handcuff, right? Absolutely. But the jury came back after looking at the totality of the circumstances and looking at everything and saying, even if he was resisting, and I'll take it even a step further, even if Chuck was resisting, which I think the evidence is clear, he was not resisting. Even if the officers believed he was resisting, it was reasonable belief he was resisting. That was from the beginning. That is our position that after the fall, he was not resisting. There was no reason a reasonable officer would have thought that way. But let me play devil's advocate for a minute. Assuming Chuck was resisting, the officers assumed he was resisting the entire time. Resisting is only one factor of Graham. And the jury was instructed on all the Graham factors and the Graham factors is what the jury uses as their basis to determine whether it was objectively reasonable for the officers to use the amount of force they did. I take it it's your position that the fact that the jury said yes to the question, did the officers reasonably believe that your client was resisting, that does not, to use a colloquial phrase, absolve them of responsibility for excessive force used thereafter. Absolutely. I think the case of Torres versus City of Mandera outlines it perfectly to say resisting is only one factor of Graham. You have to look at all the factors. And even if somebody was resisting, yes, maybe the force, you can step up the notch, the level of the force a little bit, but it still has to be reasonable for the circumstances. And I think with the jury's verdict, it was clear that looking at the totality, the officer's use of force was not reasonable in these circumstances. I do want to make one correction for the record. Mr. Bernard was not, did not have the opportunity to move his head. I think that was a statement that he was able to lift up. He actually, there is evidence, not only did Mr. Bernard complain of, he was complaining about his hips because he had had a broken hip previously, that he was complaining when he was on the floor as to him being in a lot of pain as to the hip. He also has a bruise on the back of his neck. The officers maintain that there was never any contact with the back of his neck. However, the medical evidence indicated that there was in fact a contusion on the back of his neck. Where is that in the record? Court's indulgence. Sure. 566. And Your Honor, that would be our excerpt to record. 56? 566, yes. What about the argument that the judge sort of changed the rules in the midstream? And that he sort of made a promise that the jury found, depending upon the answer, the qualified immunity would be appropriate. He did change. I mean, I think that's clear from the record. But I think what's also clear is, it was a misstatement what he said earlier. Because resisting is only one factor. It's not all the factors. So even if somebody is resisting, you can't automatically give somebody qualified immunity. But I think the appellant is arguing, wait a minute. You lay out one path that you're going to follow, and now you took a different path. I don't think it changed anybody's arguments in closing. There's no evidence that it affected how the defendants presented their case in summation. It didn't have any effect. They didn't proceed a certain way. It doesn't appear that they proceeded any differently than they would have given them a different ruling up front. So I don't think it really makes a difference. Yes, he changed his mind. I think that's clear. But there's no challenge to the basic instructions to the jury, what the jury was told about the elements of the offense and so forth. We're talking about the interrogatories. We're not talking about the written instructions. Is that correct? There was no objection to the interrogatories and then the jury instructions they were the Ninth Circuit pattern jury instructions. So there's no problem with those? No, they were self-explanatory and provided the appropriate instruction as to objective reasonableness and excessive force. And was there anything else asked for by way of special interrogatory? No, Your Honor. What happened was, as Mr. Dillard explained, there was a discussion in the 50A about wanting qualified immunity. Judge Jones said, I'm not giving you qualified immunity. And then there was a discussion about special interrogatories. The judge said that he would draft them and provide them to counsel to review. They provided them and defense counsel agreed with them and said that they were sufficient. Is the argument in the record, are the closing arguments in the record? Yes, sir. I'm sorry. I did not read them. I apologize. Did defense counsel argue, ladies and gentlemen, if you return a verdict in our favor, neither of the first two interrogatories, you can stop, got nothing else to talk about? No, Your Honor. They didn't argue that. Mr. Dillard also discussed miscellaneous errors, abusive discretion. If you take each individual, Mr. Dillard outlined or the defendants outlined quite a few miscellaneous errors. If you take them individually, there was no prejudice from any of them. There's no prejudice and there would be I have a couple minutes. So as to our cross claims for the attorney's fees and the interest. Your opponent didn't argue that. Sir, it's my understanding I don't get rebuttal, so. No, I just want you to know. Okay, then I will submit on the briefs on the attorney's fees and the interest. I'm sure I don't, but don't let me intimidate you. If you want to talk about it, do. But if you do, he gets to talk about it. If you don't, he doesn't. Well, I'd actually like to have you hear about it because the fee was cut rather substantially. It was cut substantially and our position is there was an abusive discretion for two reasons. One, one of the main things behind a civil rights case is the results obtained. We received, we were very successful in our results and the judge deminimized that by basically saying, oh, I gave you the remediator, so your fees weren't, your award wasn't that substantial when our award even was substantial with the remediator because he only knocked it down $500,000. And I say only, it's a lot of money, but it was still to another significant amount. The other thing he didn't do is he didn't take into consideration the effect that a case such as this would have on the general public as a deterrent, as just the importance of a public purpose. He didn't even consider that. And under Morales v. City of San Rafael, that case specifically says that it's an abusive discretion if these things are not taken into consideration and those were not taken into consideration. What was your, what was the hourly rate you saw? I believe my hourly rate at that time was probably $380,000. And he didn't have, the concern that he had was not as to our hourly rate. It was strictly to the hours. How many hours did you spend on the case? Totality of our whole office, $800,000. How many hours did the other side spend? About $669,000 and that's conservative, Your Honor. I had to, I had Mr. Angulu who tried the case who was lead counsel, I had had pursuant to his affidavit in response to my motion for another lawyer who was less experienced so I would imagine she was at a lower rate as well as a paralegal. So the $669,000 is a conservative number. That was taking the highest rate possible and dividing by the amount of money that was paid to them. We had a case, Paget v. Loventhal, that was handed down last Friday. Are you familiar with that case at all? Paget? Paget, P-A-G-E-T-T versus Loventhal, decided last Friday. I was wondering if you're familiar with that. I am not, Your Honor. Okay, I just wanted to, if you have any comments as to what impact, if any, that has on the attorney fee issue. I apologize, I don't. I can certainly submit a submittal briefing if the court would like. Might not be a bad idea, maybe a, um, What, what, what did the judge say? As to the attorney's fees? Two things. One was what I had just mentioned, the remitter. The other part was that he didn't feel that the case was complex and, or a novel issue. He also misquoted the actual record as far as, I believe he said we only filed one motion in limine or responded. The docket completely, that's not correct. I mean, the docket actually supports the numerous oppositions, the motions in limine we filed, the post-trial motions we filed, the responses we had to file while we were in trial as different Rule 58 motions were coming up and we had to file responses. So, the discovery, I mean, this case, when we came into this case, the lawsuit was filed in 2003. I came into this case 60 days before trial. Actually, I came in less and the judge gave me a short continuance. So, counsel had eight years to get up to speed for a trial. I had 60 days and so I had a lot to review. I had to review eight years worth of discovery and the court also doesn't mention that. He focuses in on the docket and as we all know, the discovery isn't necessarily in the docket. It's not visible in the docket. And so we had medical records and we had substantial records, depositions that we needed to review to prepare for the case. Did you have to take additional discovery? No, because at the time we came into the case, the discovery had already closed. Closed. Okay. And as for the interest, I think at this point, the other side, the defendants have conceded the post-judgment interest so I won't touch on that. The pre-judgment interest, in Nevada, we actually have a case, a District of Nevada case that I would submit that I would have thought Judge Jones may have followed. He did not follow it. In the Murphy v. City of Elko case, which is 976 F SUP 1359, the person asked for pre-judgment interest within the actual judgment such as we did and that District Court Judge in Nevada awarded it on the verdict, the pre-judgment interest from the time of the date of the verdict. And Your Honor, with that, I'm out of time so thank you. Thank you very much. You have a little time left. Your Honor, what I haven't had an opportunity to address today, and I do want to underscore it at least momentarily, is the other determinations on that jury verdict were certainly the product of a immunity. And you take it away from the officers, which violates Supreme Court law. You leave the jury on their own. And that prejudice to the defendants was furthered when Judge Jones struck our police practice expert, wouldn't let him testify at all to give color and context to the force that was used. And the reason was, well, he's going to tell me what the law is and I don't need to know that. Okay, fine, if you're going to follow the qualified immunity, do what you said you were going to do instead of just saying, well, I guess the jury didn't buy it. Well, the jury wasn't instructed on qualified immunity. They didn't give us that instruction. He struck our expert and left them to figure it out on, I don't know, what they knew from television. But to argue that there was no effect in the closing argument, to argue that it had no taint on the jury determinations is rank conjecture and I think makes no sense at all when you look at the record as a whole. Now, what Judge Jones did was he said that there was force, there was evidence of force used after handcuffing. Now, the plaintiff argued that it was limited to when that first cuff was put on. But the evidence is, and this is undisputed, your honors, one cuff was put on and everybody went down to the ground and there was a big struggle to get the second cuff on. And so, and the plaintiff's testimony was, they were saying, give me your arms, give me your arms, but they were underneath me and I couldn't give them to them because they were on top of me. So to say that the jury must have thought, oh, it only went to the initial handcuff when they went down to the ground is just lied by the evidence. So what you're left with is what I talked about earlier is officers with knee on him momentarily when the other two came on and they were rendering the scene static. For what she said, he can turn his head and that's on page 445 of our excerpt of record. The plaintiff says, and when I turn my head and look through the door at her, meaning when his came in and the officer went to secure her. So Judge Jones was absolutely right when he said, I've heard nothing in this case to suggest there was excessive force if he was resisting or if they reasonably believe he was resisting. He was right on that and we relied in good faith upon that. Why would we argue? No, we think you need to segment the here, here and there. Well, we agreed with him. He read the law, the facts right, and then just completely misapplied the law and changed the rules at the end. Okay. Thank you very much for your argument for both of you. The case just argued is submitted.
judges: Carr, Hawkins, Smith